# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| SARAH LINDSLEY, on behalf of herself and all others similarly situated,<br><br><br>   Plaintiffs,<br><br>v.<br><br>OMNI HOTELS MANAGEMENT CORP. and TRT HOLDINGS, INC.,<br><br>   Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:17-CV-2942-B |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sarah Lindsley—on behalf of herself and other women employed by Defendants Omni Hotels Management Corp. ("Omni") and TRT Holdings, Inc. ("TRT")[1]—filed suit against Defendants alleging that they discriminated against her and other women in pay and promotion decisions during the course of their employment. Lindsley moves the Court to certify four putative classes under Federal Rule of Civil Procedure 23 (Doc. 49). Because the Court finds that the proposed classes do not meet the commonality or predominance requirements of Rule 23, the Court **DENIES** Lindsley's motion.

---

[1] The Court notes that in TRT's motion for summary judgment, TRT disputes Plaintiff's claim that it ever employed Plaintiff or other Omni employees. *See* Doc. 71, Br. Summ. J. To be clear, nothing in this order should be construed as resolving that issue or any other issue raised in the pending motions for summary judgment.

# I.

# BACKGROUND

A.      *Lindsley's Individual Allegations*

Lindsley's claims arise out of her fifteen-year employment in Omni's Food and Beverage Department. Doc. 33, 2d Am. Compl., ¶ 1. Lindsley generally alleges that while working her way up Omni's executive career ladder, she was subjected to discrimination, harassment, and unequal pay based on her gender. *Id.* ¶¶ 1–7. Lindsley claims that she was paid less than men in similar roles, that she was excluded from opportunities available to men in her same position, and that she was denied promotions despite being the most qualified candidate. *Id.* ¶¶ 3–4. Lindsley alleges this sexual discrimination and harassment arose out of a "boys' club" culture in Omni's Food and Beverage Department. *Id.* ¶ 5. Lindsley asserts that this culture of discrimination affected not only her rights, but the rights of other women employed by Omni's Food and Beverage Department. *Id.* ¶¶ 8–11.

Lindsley started working as a fine-dining sever for Omni's Food and Beverage Department in 2001. *Id.* ¶ 42. This was at the Omni Tucson National Resort in Arizona. *Id.* Based on her time at the Tucson Resort, Lindsley alleges that the Food and Beverage Department both at that location and throughout Omni's corporate structure was a "boys' club." *Id.* ¶ 43. She alleges that few women were employed in executive roles at that time. *Id.* She bases these allegations, in part, on the conduct of David Morgan, the general manager at the Tucson Resort location. Specifically, she alleges that in her first meeting with Morgan, he sat uncomfortably close to her and ran his hand through her hair. *Id.* ¶ 44. Additionally, Lindsley states that she later made a formal complaint to Omni's human resources department on behalf of two other female servers who told her Morgan was sexually

harassing them. *Id.* ¶ 46. To the best of her knowledge, Lindsley states Omni took no corrective action in response to this complaint. *Id.*

Despite this alleged "boys' club" culture, Lindsley started to rise in the Food and Beverage Department. In 2007, Lindsley was promoted to a supervisory role, earning about $10 per hour. *Id.* ¶ 49. Lindsley alleges she earned this promotion over Morgan's disapproval of her capability to succeed in this new role. *Id.* ¶¶ 48–49. As a supervisor, Lindsley alleges she was required to work overtime on nights and weekends without compensation, while her male counterparts got by on the bare minimum. *Id.* ¶ 49. She also alleges that she was tasked with performing the duties of a manager, such as creating menus and opening new restaurants at the resort, even though she earned the lower salary of a supervisor. *Id.* ¶ 50. In 2008, Lindsley was again promoted, this time as an outlet manager at the Tucson Resort. *Id.* ¶ 52. Right before she was promoted, Morgan left his employment at Omni. *Id.* ¶ 51. As an outlet manager, Lindsley earned a salary of $40,000 a year, an amount she believes was less than what the male outlet manager that previously held the position earned. *Id.* ¶ 52.

A year later in 2009, Lindsley applied to be the general manager of the premium fine-dining outlet at the Tucson Resort; however, she was informed she needed a sommelier certification to be eligible for consideration. *Id.* ¶¶ 53–54. Lindsley obtained her sommelier certification and was promoted to general manager of the outlet. *Id.* ¶ 55. She earned a salary of $45,000 in this role, which she alleges was $5,000 less than the male general manager that previously held that role. *Id.* She further alleges that this previous manager did not have a sommelier certification. *Id.*

In 2012, the operations director at Tucson asked her to apply for the assistant director role of the Corpus Christi Food and Beverage Department. *Id.* ¶ 56. This position would require Lindsley

to manage food and beverage services at two hotels with eleven restaurants and outlets between them. *Id.* ¶ 57. Initially, when offered the job, the HR director in Corpus Christi told Lindsley her starting salary would be $65,000. *Id.* ¶ 58. But two weeks later, Lindsley received a written offer letter which stated her salary would be only $57,000. *Id.* ¶ 59. Lindsley alleges that the HR director who made the original offer apologized to her for the decrease and told her that Omni's corporate office required that he make her that offer. *Id.* ¶ 60. Lindsley rejected the written offer and made a formal complaint to the Tucson Division's HR director. *Id.* ¶ 61. Sometime later, David Morgan, who Omni had rehired as the vice president of the entire Food and Beverage Department, called Lindsley about the Corpus Christi position. *Id.* ¶¶ 63–64. Lindsley alleges that Morgan "threatened" her, stating if she refused to take the Corpus job at the $57,000 salary her career at Omni would suffer. *Id.* ¶ 64. She alleges that Morgan gave her until the next morning to accept the job. *Id.* Lindsley alleges the pressure from Morgan caused her to accept the job the next day. *Id.* ¶ 65.

Lindsley started working as the assistant director of the Corpus Christi Food and Beverage Division in June of 2010. *Id.* ¶ 66. She alleges that this property was "in a state of disarray due to mismanagement" when she arrived. *Id.* Lindsley alleges that the director of Corpus' Food and Beverage Division at that time was incompetent and that she effectively performed his duties without receiving his salary. *Id.* Around one year later, the director resigned, and Lindsley was asked to officially fill his role. *Id.* ¶¶ 67–68. At this time Lindsley had been employed in Omni's Food and Beverage Department for over ten years. *Id.* She was offered a salary of $64,000 for the director position; in comparison, she alleges, her male predecessor earned $80,000 as the Corpus Christi director despite working at Omni for just two years with no experience in its Food and Beverage

Departments. *Id.* ¶ 69. Lindsley lodged another complaint with HR about this pay disparity. *Id.* ¶ 70. The HR director allegedly told her that Morgan was not willing to sign off on a salary increase. *Id.* Notwithstanding this, Lindsley took the job because she felt like it was her only option if she wanted to continue her career at Omni. *Id.* ¶ 71.

The promotion made Lindsley the first female director of any of Omni's Food and Beverage Departments. *Id.* ¶ 72. It also made her an Omni executive. *Id.* However, Lindsley alleges she was still subject to pay discrimination and not provided with the same opportunities as male executives in similar positions. *Id.* For example, Lindsley alleges that she was given the lowest starting salary in company history for the Corpus Christi Food and Beverage director position. *Id.* ¶ 73. Lindsley asserts that her starting salary as director was actually below the company's stated minimum amount for the position. *Id.* ¶ 85. She also alleges that she was earning less than several of the men she supervised. *Id.* ¶ 84.

As for Omni not providing her with the same opportunities as other male directors, she alleges that Morgan led a trip to France for all Omni Food and Beverage directors, but that Morgan told her she could not attend because she had held her position for less than a year. *Id.* ¶¶ 75–76. Lindsley, on information and belief, alleges that other male Food and Beverage directors that had held their positions for less than a year were invited, and that no females executives attended the retreat. *Id.* ¶¶ 77–78. Moreover, when she was invited on a company trip to Chile, Lindsley alleges she was repeatedly subjected to sexual harassment. *Id.* ¶¶ 80–81. Lindsley estimates that fifty Omni executives attended this promotional trip but that only two of them, including herself, were women. *Id.* She alleges that throughout the trip male executives made comments about her appearance and

"her ability to earn money as a prostitute." *Id.* She further alleges she was "ostracized" for refusing to join male executives' visits to brothels and strip clubs. *Id.* ¶ 82. After this trip, she filed a complaint with HR, but she is currently unaware of any corrective action that was taken in response to this complaint. *Id.* ¶ 83.

Additionally, Lindsley alleges further harassment and retaliatory conduct on the part of Morgan. For example, in a 2012 meeting in Corpus Christi, Lindsley alleges that Morgan placed his hand over her mouth to keep her from speaking in front of the staff she supervised. *Id.* ¶ 86. She also alleges that during this meeting, Morgan told her that she would "never go anywhere but Corpus Christi" and that she "better get good and comfortable." *Id.* ¶ 87. Lindsley reported Morgan's conduct to her HR director, as well as the director of finance and the general manager of the property. *Id.* ¶ 89.

Sometime after this meeting, Morgan allegedly "decreased" five of Lindsley's annual-review ratings from "exceeds" to "meets" without explanation. *Id.* ¶ 90. Lindsley alleges that this was done "in an effort to ensure that she did not receive a higher raise." *Id.* She states that before this, she had never in her career received a rating below "exceeds." *Id.* Lindsley reported these actions to her HR director, stating they were discriminatory and done in retaliation of her previous complaints. *Id.* ¶ 91. Because of this, three of her ratings were changed back so as not to affect her annual raise. *Id.*

In 2015, Lindsley claims she had hit the "glass ceiling" at Omni. *Id.* ¶¶ 98–105. Although, as she states, the Corpus Christi Food and Beverage Division was excelling under her management, Morgan and the greater corporate Food and Beverage Department continued to treat her unequally. *Id.* As an example, Lindsley alleges that the director of the Houston Food and Beverage Division

contacted her and asked if she would be interested in filling his role because he was being promoted to another position. *Id.* ¶ 101. Interested in this opportunity, Lindsley emailed Morgan twice to see if he would support this potential promotion. *Id.* ¶ 102. Lindsley alleges he failed to respond. *Id.* Nonetheless, Lindsley interviewed for the job and alleges it went very well—she discussed finalizing details about salary, relocation, and the offer letter. *Id.* ¶ 103. However, during her final interview in August 2015, Lindsley alleges that the general manager of the Houston Omni told her that Morgan contacted him the day before and told him that Lindsley was not the "quality" they needed for the Houston hotel. *Id.* ¶ 104. Right after the interview, Lindsley filed another formal complaint with her HR director and the Corpus general manager, as well as the corporate director of HR. *Id.* ¶ 105.

Next, on September 23, 2015, Lindsley filed an official Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC). *Id.* ¶ 106. After she filed this charge, she alleges that others at the company discovered it and started to retaliate against her. *Id.* ¶¶ 107–08. For example, she alleges the general manager of the Corpus Christi Omni started to hold meetings with her team in an effort to exclude her. *Id.* ¶ 109. Lindsley alleges that this same manager also took on her responsibilities of implementing menu promotions, and reviewing and disciplining Food and Beverage team employees. *Id.* ¶¶ 110–11. In November 2016, she reported this conduct to management. *Id.* ¶ 112. In response, the general manager allegedly screamed at her while banging his fists on her desk. *Id.* Lindsley also reported this to her HR director. *Id.* ¶ 113.

The last purported discriminatory event was Lindsley's meeting with her same general manager regarding her 2015 performance review. *Id.* ¶ 123. This meeting occurred when she

returned from her medical leave in April 2016. *Id.* She alleges that she discovered at the meeting that her general manager had lowered her 2015 ratings, which dropped her overall rating from a five to a three. *Id.* Lindsley alleges her review "knowingly eliminated" many of her accomplishments from the previous year. *Id.* ¶ 124. She further alleges that when she asked her general manager questions about the review, he told her that she "needed to drop this entire thing" and "let it go because it wasn't looking good for her at Omni." *Id.* ¶ 125. Lindsley alleges the manager made false claims and accusations about her performance during this meeting. *Id.* ¶ 127. Finally, she asserts that because of this meeting, false rumors about her and her performance were spread throughout the Corpus Christi Property. *Id.* ¶ 129. Lindsley requested and was granted additional medical leave in May 2016. *Id.* ¶ 132. In June 2016, she alleges she was "constructively discharged." *Id.*

In sum, Lindsley alleges that despite fifteen years of exceptional performance at Omni, she was pushed out in retaliation for "some combination of her filing the EEOC Charge, exercising her FMLA rights, and otherwise challenging Defendants' practices towards her and other women[.]" *Id.* ¶ 131.

B.    *Class Allegations*

Lindsley separately alleges facts related to her Rule 23 arguments. Lindsley amended her complaint to include class allegations after discovering pay and promotion information from one of Defendants' former employees. Doc. 49, Mot. for Class Cert., 5–6. She alleges that this information shows how women at Omni were paid and promoted at disparate levels compared to men. *Id.* Based on this information, Lindsley seeks to certify four classes of similarly situated plaintiffs under Rule 23. The first two classes are the "Pay Plaintiffs" and the "Promotion Plaintiffs." Doc. 33, 2d Am. Compl.,

¶ 9. The Pay Plaintiffs are/were females employed in supervisory positions within Defendants' Food and Beverage Department who were paid significantly less than similarly situated male employees on the basis of their sex. *Id.* The Promotion Plaintiffs are/were females employed in supervisory positions in the Food and Beverage Department who were subjected to promotional barriers and obstacles because of their sex. *Id.*[2] The second two classes are identical to the first two classes except that they are limited to women employed in Texas. Lindsley calls these classes the "Texas Pay Plaintiffs" and the "Texas Promotion Plaintiffs." *Id.* ¶ 10.

Lindsley alleges all class Plaintiffs are and were subjected to Defendants' companywide policy and practice of discriminating against female Food and Beverage employees on the basis of their sex through pay and promotion disparities. *Id.* ¶ 139. As for the Pay and Texas Pay Plaintiffs, Lindsley alleges they performed equal work and were at least equally qualified and experienced, yet they were paid less than similarly situated males on the basis of their sex. *Id.* ¶¶ 140–49. She cites to pay data from various Omni properties to allege that women in the Food and Beverage Department were paid, on average, less than similarly situated men at these properties. *Id.* Finally, she alleges that Omni has a policy of increasing an employee's pay by only 10% upon promotion, but that this policy was applied almost exclusively to women. *Id.* ¶¶ 146–48. She alleges that men were rarely limited to this

---

[2] The Court notes a discrepancy in Lindsley's class definition found both in her pleadings and class certification motion. Initially, Lindsley defines her promotion class as composed of only women who held *supervisory* positions in the Food and Beverage department. Doc. 33, 2d Am. Compl., ¶ 9. And she also states that "Rule 23 Plaintiffs are/were all employed in supervisory positions . . . ." *Id.* ¶ 136. But later in the complaint, she defines the Promotion Plaintiffs as "*All females* employed by Defendants within the Food and Beverage department during the relevant time period . . . ." *Id.* ¶ 192 (emphasis added). Further, in her class certification motion, she defines the Promotion Plaintiffs in that same way. Doc. 49, Pl.'s Mot. for Class Cert., 2. Regardless of which class definition Lindsley intended, the Court's decision in this order does not hinge on this discrepancy. Applying either definition results in the same outcome.

maximum. *Id.* ¶¶ 146–47.

With respect to the promotion classes, she alleges that Defendants "intentionally fostered a corporate culture and practice of a male dominated workplace" in the Food and Beverage Department. *Id.* ¶ 150. This culture allegedly provided males with the advantage in promotional opportunities over females. *Id.* Lindsley further alleges that this culture was an unlawful policy and practice, and that it was a purposeful barrier to prevent women from seeking or receiving promotions. *Id.* ¶ 151. She alleges this policy or practice manifested itself in males receiving benefits, such as placement at premier properties, recognition in companywide newsletters, committee positions, and opportunities to attend corporate trips, which all resulted in greater promotional opportunities for men. *Id.* ¶¶ 152–64. She alleges that the women in the promotion classes were excluded from and deprived of these opportunities. *Id.* Finally, she alleges that a "boys' club" culture in the workplace exacerbated these obstacles for women. *Id.*

C.      *Defendants' Compensation and Promotion Policies*

Defendant Omni operates 47 hotels across North America. Doc. 54-1, Defs.' Resp., 4.  At each of these locations, there is a Food and Beverage Department. *Id.* at 6. And at almost all of these departments, there is a Food and Beverage director, who oversees the department. *Id.* The Food and Beverage Departments vary greatly depending on the hotel size and number of outlets onsite; this means that the responsibilities and roles of the Food and Beverage directors vary greatly based on the location. *Id.* There is also a general manager at each hotel. *Id.* at 9. Omni describes these general managers as "CEOs" of their properties; they maintain decision-making authority with respect to hiring, firing, compensation, and selection of applications for promotions and transfers. *Id.*

With respect to compensation, Omni uses the Hotel Industry Compensation Survey ("HICS"), which compiles data that is used "to create salary ranges for each salaried position at each hotel each year." *Id.* at 7. Salary ranges span 20% above and below the median salary point for each position. *Id.* Omni "expects that the midpoint of a salary range is for an individual with 3–4 years of relevant experience in the desired position." *Id.* Omni's stated goal is to have at least 75% of its salaried employees making salaries within the HICS range for their respective position. *Id.* Generally, when an employee is promoted, a 10% salary increase is recommended. *Id.* at 8. However, when an employee is promoted and his or her salary is below the HICS minimum range, a 15 to 20% increase of the employee's current salary is permitted, with a six-month review cycle, unless market conditions warrant a greater increase. *Id.* When an employee is promoted to a new position, where he or she has little experience, Omni's compensation guidelines specify that he or she should be paid at or below the minimum range and that "it is acceptable for a new manager to have a salary below people on his or her team." *Id.*

Depending on the position, salaries are determined by a group of various supervisors—*e.g.*, the general manager and the directors of HR and finance of the specific hotel, and the appropriate executive-committee members. *Id.* at 7. Working off Omni compensation guidelines by hotel, these supervisors take into account the specific amount budgeted for the position based on the hotel, the HICS salary range, and other factors. *Id.* Salaries that deviate from the guidelines often require additional approval. *Id.* Omni stresses that most compensation decisions are determined by the hiring hotel, not by Omni's corporate office. *Id.* at 7–8. But this is not always the case. For example, corporate executives may have input into salaries for higher-ranking employees at individual hotels,

such as directors of Food and Beverage. *Id.* at 8.

As for promotions and transfers, Omni states that they strongly encourage employees to "seek challenging career alternatives within the company." *Id.* If the employee meets certain requirements (*e.g.*, background checks, at least 90 days in current position, job requirements) and if he or she obtains proper approval, the employee can apply for a promotion or transfer. *Id.* at 8–9. Most employees must obtain approval from their hotel's general manager, their respective executive-committee members, and the hotel's HR director. *Id.* However, for employees applying to positions at the executive-committee level, like a director of Food and Beverage, they must also get approval from the corporate-level vice president of that department, as well as the hotel's general manager and HR director. *Id.* After they have met these requirements and obtain the proper approval to apply, the decision to approve the promotion or transfer rests solely with the transferee hotel's general manager. *Id.* Corporate-level vice presidents do not have authority to make such decisions at this stage, although their recommendations or insights may be provided. *Id.* Additionally, for lower-level supervisory employees in the Food and Beverage department, the transferee hotel's director of Food and Beverage, or other supervisory employees aside from the hotel's general manager, may have significant input in transfer/promotion decisions. *Id.*

Finally, Omni states that it has an explicit policy that all employment decisions shall be made without regard to sex or any other criteria prohibited by federal, state, or local law. *Id.* at 4. Omni also explicitly prohibits sexual harassment, specifically "unwelcome or offensive conduct of a discriminatory nature that affects an individual's employment opportunities or that creates an intimidating or hostile work environment." *Id.* at 4–5. Omni claims they maintain an "open door

policy" to encourage employees that have concerns with discrimination or harassment to report those concerns. *Id.* at 5. Omni claims it takes all allegations of discrimination and harassment seriously and that it investigates all complaints. *Id.* These policies are provided to all employees via an employee handbook and Omni's intranet. *Id.* Further, each hotel must conduct at least one workplace-harassment training session per year. *Id.* Some hotels provided additional trainings, but it is not mandatory to do so. *Id.*

## II.

## LEGAL STANDARD

"A district court must conduct a rigorous analysis of the [Federal Rule of Civil Procedure 23 ("Rule 23")] prerequisites before certifying a class." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). The burden of proof rests with the party seeking certification. *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 301 (5th Cir. 2003). The trial court's inquiry is a procedural one, focusing on whether Rule 23 is satisfied; "[c]lass certification hearings should not be mini-trials on the merits of the class or individual claims." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). "Although this inquiry does not resolve the case on its merits, it requires that the court look beyond the pleadings to 'understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003) (quoting *Castano*, 84 F.3d at 744).

Under Rule 23(a), plaintiffs seeking certification bear the burden of meeting the Rule's requirements of (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Courts deciding

whether to grant class action certification must conduct a rigorous analysis to ensure that each of Rule 23(a)'s requirements have been met. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). Further, plaintiffs also bear the burden of showing that the proposed class action meets at least one of the Rule 23(b) requirements. Fed. R. Civ. P. 23(b); *Amchem*, 521 U.S. at 614. Before a class may be certified under Rule 23(b)(3), "a court must also determine that 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members' and that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'"[3] *O'Sullivan*, 319 F.3d at 738 (quoting Fed. R. Civ. P. 23(b)(3)). "The predominance and superiority requirements are 'far more demanding' than is rule 23(a)(2)'s commonality requirement." *Id.* (quoting *Amchem*, 521 U.S. at 624). A determination of whether legal issues common to the class predominate over individual issues requires the court to inquire how the case will be tried. *Id.* (citing *Castano*, 84 F.3d at 744). As explained by the Fifth Circuit:

> This [inquiry] entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class. Although this inquiry does not resolve the case on its merits, it requires that the court look beyond the pleadings to "understand the claims, defenses, relevant facts, and applicable substantive law." Such an understanding prevents the class from degenerating into a series of individual trials.

*Id.* (citing *Castano*, 84 F.3d at 744). Further, to predominate, "common issues must constitute a significant part of the individual cases." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 626 (5th Cir. 1999) (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)).

---

[3] Because Lindsley seeks certification under Rule 23(b)(3), the Court does not examine whether her proposed classes could or would qualify for certification under Rule 23(b)(1) or Rule 23(b)(2).

# III.

# ANALYSIS

As the party seeking certification, Lindsley bears the burden of meeting Rule 23's requirements. Because the Court finds that Lindsley has not satisfied either Rule 23(a)(2)'s commonality requirement or Rule 23(b)(3)'s predominance requirement, the Court denies Lindsley's motion.[4]

A.  *Commonality Under Federal Rule of Civil Procedure 23(a)(2)*

Lindsley asserts that the commonality requirement for all four of her proposed classes is met because: (1) the two Pay Plaintiff classes were subjected to a pattern and practice of employment discrimination by being paid less than their similarly situated male coworkers on the basis of their sex; (2) the two Promotion Plaintiff classes were deprived of promotional opportunities that similarly situated male coworkers were provided on the basis of their sex ; and (3) all four proposed classes suffered from sex discrimination because of the same corporate policy of maintaining a "boys' club," which perpetuated pay and promotional disparities from the highest level. Doc. 49, Mot. for Class Cert., 11. Lindsley further argues that all proposed class members have in common the same corporate HR department that implemented the discriminatory polices and the same VP of Food and Beverage, David Morgan. *Id.* at 14.

Defendants respond that Lindsley has not satisfied commonality as the Supreme Court has

---

[4] The parties also dispute whether Lindsley has satisfied the numerosity, typicality and adequacy requirements of Rule 23(a). But because the Court has found that Lindsley has not satisfied the commonality and predominance requirements, the Court does not reach the other requirements. *See Simms v. Jones*, 296 F.R.D. 485, 500 (N.D. Tex. 2013) (finding it unnecessary to reach other Rule 23 requirements where numerosity and predominance not met).

required in an employment-discrimination case like this one. Specifically, Defendants argue that Lindsley has produced no evidence showing: (1) that Defendants used some companywide testing procedure or other evaluation method that can be charged with bias; or (2) that Defendants operated under a "general policy of discrimination." Doc. 54-1, Defs.' Resp., 19.

To start, the Court notes that the parties strenuously debate whether Lindsley's class allegations are foreclosed by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), so the Court takes a brief detour to discuss that case and determine its applicability here. In *Dukes*, the Supreme Court considered Rule 23 certification of "one of the most expansive class actions ever." 564 U.S. at 342. The district court in that case certified a class of about 1.5 million current and former female employees of Wal-Mart, who alleged they were discriminated against in pay and promotion decisions because of their sex. *Id.* Similar to this case, the *Dukes* plaintiffs alleged that "the discrimination to which they have been subjected is common to *all* Wal-Mart's female employees" because of "a strong and uniform 'corporate culture'" of gender bias. *Id.* at 345 (emphasis in original). While no express corporate policy of discrimination was alleged, the plaintiffs claimed that their local managers' discretion over pay and promotion decisions was "exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees" under Title VII. *Id.* at 344–45. Wal-Mart's awareness of this effect and refusal to rectify it, the plaintiffs argued, was evidence of disparate treatment. *Id.* at 345. The Supreme Court had to decide "whether the certification of the plaintiff class was consistent with Federal Rules of Civil Procedure 23(a) and (b)(2)." *Id.* at 342.

With respect to Rule 23(a), the Court stated that "[t]he crux of this case is commonality—the rule requiring a plaintiff to show that 'there are questions of law or fact common

to the class.'" *Id.* at 349 (citing Fed. R. Civ. Pro. 23(a)(2)). The Court went on: "Commonality

requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.* at

349–50 (citing *Falcon*, 457 U.S. at 157). This means, the Court explained, that the common

contention "must be of such a nature that it is capable of classwide resolution—which means that

determination of its truth or falsity will resolve an issue that is central to the validity of each one of

the claims in one stroke." *Id.* at 350. "What matters to class certification . . . is not the raising of

common 'questions'–even in droves—but, rather the capacity of a classwide proceeding to generate

common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original) (quoting

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132

(2009)).

      In analyzing commonality in the context of an employment-discrimination case, the Court

applied the framework from one of its earlier cases in this area, *General Telephone Co. of Southwest

v. Falcon*, 457 U.S. 147 (1982). *Id.* at 352. In *Falcon*, the Court reversed the certification of a class

of employees who claimed racial discrimination in promotion practices because the district court

erred in finding that the commonality and typicality requirements had been met. 457 U.S. at 157–59.

In its holding, the Court explained:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been
> denied a promotion [or higher pay] on discriminatory grounds, and his otherwise
> unsupported allegation that the company has a policy of discrimination, and (b) the
> existence of a class of persons who have suffered the same injury as that individual,
> such that the individual's claim and the class claim will share common questions of
> law or fact and that the individual's claim will be typical of the class claims.

*Dukes*, 564 U.S. at 352–53 (alterations in *Dukes*) (quoting *Falcon*, 457 U.S. at 157). The *Falcon*

Court provided two ways in which this commonality/typicality gap might be bridged: (1) if applicants

or employees were prejudiced by an employer's biased testing procedure; or (2) if there is "significant proof" that an employer had a general policy of discrimination that manifested itself in hiring and promotion practices "in the same general fashion, such as through entirely subjective decisionmaking processes." 457 U.S. at 159, n.15.

Applying these principles, the *Dukes* Court determined that only the second method of bridging the gap was relevant because Wal-Mart had no testing procedure or other companywide evaluation method. *Dukes*, 564 U.S. at 353. As for the second method—significant proof of a general policy of discrimination—the Court held that was "entirely absent" from the case. *Id.* The plaintiffs' only evidence of a general policy of discrimination was testimony from their sociological expert, who testified that Wal-Mart's corporate culture made it vulnerable to gender bias. *Id.* at 353–54. However, the Supreme Court held this "testimony does nothing to advance [the plaintiffs'] case" because the expert could not testify with any certainty as to the percentage of employment decisions that were affected by gender bias at Wal-Mart. *Id.* at 354. The Court went on to explain how Wal-Mart's policy of allowing local supervisors to have discretion over employment matters was not a general policy of discrimination. *Id.* at 355. While one lower-level supervisor's discretion may form the basis of a Title VII claim for some employees in the company, its mere existence "does not lead to the conclusion that every employee in a company using a system of discretion has such a claim in common." *Id.* The Court reasoned that "demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's." *Id.* at 355–56.

The Court also discounted the plaintiffs' statistical evidence of regional and national data that revealed "statistically significant disparities between men and women at Wal-Mart." *Id.* at 356.

The Court held that a regional pay disparity was not sufficient to establish a uniform theory of disparity across every Wal-Mart store, and thus the plaintiffs' theory of commonality failed. *Id.* at 356–57. Further, and more relevant to this case, the Court held that without identifying a "specific employment practice," just showing a sex-based disparity in pay or promotions based on a policy of discretion is not enough to certify a class. *Id.* at 357.

Finally, with respect to the plaintiffs' anecdotal evidence of discrimination—120 affidavits detailing their experiences of discrimination—the Court held that this was "too weak to raise any inference that all the individual, discretionary personnel decisions are discriminatory." *Id.* at 358. The Court noted that these 120 affidavits accounted for only about 1 in every 12,500 class members. *Id.* The Court continued: "[e]ven if every single one of these accounts is true, that would not demonstrate that the entire company operates under a general policy of discrimination, which is what [plaintiffs] must show to certify a companywide class." *Id.* (citations and quotations omitted; alterations incorporated).

Thus, in analyzing commonality, *Dukes* requires this Court to determine whether Lindsley has shown that the claims of the putative class members here depend upon some common contention that is capable of classwide resolution. Lindsley has alleged that her four proposed classes all suffered a Title VII injury because the class members were either (1) paid less than their similarly situated male coworkers or (2) deprived of promotional opportunities that similarly situated male coworkers were provided. Doc. 49, Mot. for Class Cert., 11. But, as *Dukes* explains, "the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated

at once." *Dukes*, 564 U.S. at 350. Instead, Lindsley must show that "some glue hold[s] the alleged *reasons*" for Defendants' alleged pattern and practice of discrimination together, such that "examination of all the class members' claims for relief will produce a common answer to the crucial question of *why was I disfavored*." *Id.* at 352 (emphasis in original).

Lindsley argues that Defendants' employment decisions are glued together in three ways. First, every proposed class member is or was subject to the same corporate HR department. Doc. 49, Mot. for Class Cert., 14. Second, every proposed class member has or had David Morgan as their VP of Food and Beverage. *Id.* And third, every proposed class member is or was the victim of the same "boys' club" corporate culture. *Id.* The Court must determine whether these factual theories are "significant proof" that Defendants "operated under a general policy of discrimination."[5]

First, Defendants' corporate HR department—Lindsley argues that every class member was subject to the "same compensation and salary guidelines." Doc. 49-9, Pl.'s App., 142:13–143:1 (Ex. 8, Rothschild Dep.). Omni's compensation and promotion guidelines are discussed at length above. Salary ranges were set according to a uniform corporate policy. *Id.* at 64:2–65:21. Employees were evaluated based on a form designed and distributed by corporate. *See id.* at 134:14–136:2. Further, the corporate HR department was, in some way, involved in deciding promotions for director-level positions in the Food and Beverage Department. *Id.* at 66:12–67:2 (testifying that once a candidate is considered for an executive-compensation-level role, corporate approval was needed). It was also involved in compensation decisions. *Id.* at 58:11–61:12; Doc. 49-10, Pl.'s App., 63:1–66:25,

---

[5] Because Lindsley has not alleged that Defendants used some biased testing procedure to evaluate employees, the Court looks only to this second method of bridging the conceptual gap discussed in *Dukes* and *Falcon*. *See Dukes*, 564 U.S. at 352–53 (citing *Falcon*, 457 U.S. at 152, 157–58, & 159 n.15).

88:12–20 (Ex. 9, Burns Dep.). Finally, Lindsley argues that corporate HR had a "dotted line" connection with the HR leaders at each individual Omni property. Doc. 49, Mot. for Class Cert., 12; *e.g.*, Doc. 49-10, Pl.'s App., 66:14–17 (Ex. 9, Burns Dep.).

Defendants dispute Lindsley's argument that this evidence is significant proof of a general policy of discrimination. They first note that Omni has an express policy that prohibits gender discrimination. Doc. 54-1, Defs.' Resp., 19; *see also id.* at 4–5. The official policy states that Omni prohibits "unwelcome or offensive conduct of a discriminatory nature that affects an individual's employment opportunities or that creates an intimidating or hostile work environment." *Id.* at 4–5. Defendants note that Omni encourages employees with discrimination or harassment complaints to come forward so that Omni's HR department can investigate these complaints. *Id.* at 5. Defendants next dispute Lindsley's contention that corporate HR employees "often directly weighed in on questions of compensation for supervisory-level Food and Beverage employees"; they show that compensation decisions are generally handled by the hiring hotel, not the corporate office. *Id.* at 7–8 (citing Doc. 54-3, Defs.' App., 5 (Rothschild Aff. ¶ 9); Doc. 54-7, Defs.' App., 19–32 (Omni Compensation and Salary Administration Guidelines)). Defendants allege that the general manager of each hotel is effectively the "CEO" of his or her hotel, with final decision-making authority on most hiring, promotion, and transfer decisions. Doc. 54-1, Defs.' Resp., 9. While input from corporate employees, such as VPs of Omni departments, is needed for some executive-committee and higher-level positions, Defendants argue the same is not true for most lower-level supervisory positions because managers and directors at the hiring hotel make those decisions. *Id.* at 28 (corporate-approval matrix for offers, relocations, and performance reviews). Finally, Defendants

argue that, regardless of the mischaracterization of their compensation structure, Lindsley has not explained how, why, or even whether this alleged practice ever led to any discriminatory impact for any employee.

The Court finds that Defendants have the better side of this argument. The first concern the Court has is that Lindsley's proposed classes do not differentiate between the various levels of "supervisory employees" at Omni. Approval for compensation and promotion decisions varies greatly based on the specific supervisory or managerial role. Doc. 54-7, Def.'s App., 19–32. So, each compensation or promotion decision for the purported class members would involve different inputs and approvals depending on the role. The fact that most employment decisions for lower-level supervisory positions are made by the employee's respective hotel and at the discretion of that hotel's general manager militates against finding that a general policy of discrimination pervaded these decisions. *See Dukes*, 564 U.S. at 353 ("The whole point of permitting discretionary decisionmaking is to avoid evaluating employees under a common standard."). And Lindsley does not specifically allege, let alone produce significant proof of, where in this compensation system the alleged discriminatory effect takes hold. The fact that Omni's corporate HR department promulgates the same forms and guidelines for compensation and promotion decisions, while reviewing only *some* of those decisions, does not support Lindsley's argument that the proposed class members' claims depend on common contentions. Nor is it significant proof of a general policy of discrimination. Lindsley does not show how she or any other Omni employee was discriminated against based on Defendants' compensation guidelines or HR department. Thus, the Court does not find this evidence is sufficient to satisfy commonality under *Dukes*. *See Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d

174, 200 (D.D.C. 2017) (holding no commonality, in part, because it was "insufficient to point to the performance appraisal system *as a whole* and contend, as Plaintiffs do, that it acted as 'an identical or similar headwind against all classmembers.'") (emphasis in original).

Second, David Morgan, VP of the Food and Beverage Department—Lindsley next argues that Morgan, as the "kingpin of the boys' club" and VP of the Food and Beverage Department, is the reason for Defendants' discriminatory treatment. Doc. 49, Mot. for Class Cert., 13. Above, the Court detailed Lindsley's personal allegations of harassment and discrimination related to her interactions with Morgan. Lindsley argues that her complaints and three other incidents reported to the company support the finding that Morgan was the "standard-bearer" for the "boys' club" at Omni. *Id.* at 15. Lindsley contends that his position as the VP of Food and Beverage gave him control over all of the Department's pay, promotion, and transfer decisions, and thus evinced a general policy of sex discrimination against the proposed class members.

Defendants respond that Lindsley's argument falls short because she has not articulated how Morgan holding the position of VP caused class members to be treated differently in pay or promotion decisions. Doc. 54-1, Defs.' Resp., 20. Despite Lindsley's claim that Morgan had "omnipotence" in the Food and Beverage department and control of employment decisions, Defendants argue Morgan and other operational VPs at Omni did not have authority to hire Food and Beverage directors at any specific hotel; they assert that only the general managers of the individual hotels had this authority. *Id.* They further respond that Morgan, as an operational VP, had only general oversight responsibilities in his department. *Id.* Thus, Defendants conclude, Morgan cannot be the "glue" for any particular pay or promotion decisions in relation to the proposed class

*members because he didn't make those decisions. Id.*

The Court first notes that nothing in this Order should be construed to discount the merit of Lindsley's individual claims against Defendants. That said, as for her class action allegations related to Morgan, the Court finds that they are not sufficient to satisfy the commonality requirement. Lindsley's allegations related to Morgan are highly personalized as to her—she has brought forth no proof that Morgan's decision-making or influence actually affected the pay or promotion decision of another woman working at Omni. Her allegations related to Morgan—that he refused to increase female employees' pay and failed to provide female employees with that same opportunities as male employees—are based solely on her own declaration recounting her personal experience. *See* Doc. 49, Mot. for Class Cert., 4–5 (citing Doc. 49-5, Pl.'s App., 299 (Ex. 4, ¶ 25)); *see also Falcon*, 457 U.S. at 159 ("If one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential companywide class action.").

Further, Lindsley has not shown how Morgan's perpetuation of a "boys' club" has had an effect on anyone's employment aside from her own. It is also, at best, unclear whether and to what extent Morgan *could* or *did* make pay or promotion decisions for the employees that Lindsley alleges are part of her proposed classes. Specifically, Lindsley's proposed classes are purportedly composed of either (1) all female employees in supervisory positions in the Food and Beverage Department or (2) all female employees, regardless of position, in the Food and Beverage Department. *See supra* note 2. But Lindsley does not dispute that most employment decisions, including hiring, firing, compensation, and applicant selection, are made almost exclusively by the general managers of the

individual hotels where the employee works. *See* Doc. 54-1, Defs.' Resp., 9. According to Defendants, it was, in fact, very rare for the VP of a corporate operational department—*e.g.*, Morgan—to have "any input in determining the salary for a lower-level supervisor or manager within a hotel's [Food and Beverage] Department." *Id.* at 8. To be sure, some courts have found commonality where "every promotion decision was ultimately made by" the discriminating supervisor in question. *See In re Johnson*, 760 F.3d 66, 73 (D.C. Cir. 2014) (holding it was crucial to the commonality determination that all promotion decisions were made by the same Director of the Secret Service). That is not this case—Lindsley's proposed classes involve a number of different positions and locations, many of which needed no input or approval from Morgan on employment decisions.

Defendants admit that Morgan would have had to provide input on transfers, promotions, and pay decisions for employees at the executive-committee level. *Id.* at 9. But Lindsley does not point to anyone aside from herself who may have been treated unfavorably in pay or promotion because of a decision made or discretion exercised by Morgan. And her interactions with Morgan are very individualized and specific as to her with no indication that he was exercising his authority as VP of Food and Beverage to cause disparate pay and promotional decisions on the basis of sex. *See supra* Part I.A. Thus, Lindsley's proof related to Morgan does not show that he made any decisions or used his discretion in a common way that would make this case better suited for resolution as a class action.

Third, the "boys' club"—Lindsley argues that each proposed class member has in common the general discriminatory policy that Omni ran a "boys' club." Doc. 49, Mot. for Class Cert., 11. However, *Dukes* forecloses this argument.

In *Dukes*, the plaintiffs attempted to prove a general policy of discrimination at Wal-Mart by providing expert-witness testimony on Wal-Mart's "strong corporate culture," that made it "vulnerable to gender bias" in employment decisions. *Dukes*, 564 U.S. at 354 (internal quotations omitted). The Court disregarded this expert's testimony; specifically, the Court held that it was "worlds away" from showing commonality because the expert could not say with any certainty "how regularly stereotypes play a meaningful role in employment decisions at Wal-Mart." *Id.* at 354–55. Here, Lindsley has brought forth no expert testimony to support her claim that there was some social framework operating at Omni that infected employment decisions with gender bias. And Lindsley has not shown with any specificity that a "boys'-club" environment affected decisions related to pay or promotions. Without a showing that the "boy's club" "manifested itself in hiring and promotion practices in the same general fashion," *id.* at 353, this Court is unwilling to find that Omni operated under a general policy of discrimination based on these allegations.

Finally, the Court notes that neither Lindsley's "statistical" nor anecdotal evidence sufficiently supports commonality here.

Starting with the statistical evidence, the Court acknowledges the concerns raised about the admissibility of this evidence in Defendants' motion to strike (Doc. 56). Without deciding the issue of whether this evidence should be struck, the Court finds that even if it is considered here, it does not do enough to satisfy commonality in light of *Dukes*. In *Dukes*, the plaintiffs attempted to show with statistical evidence that all Wal-Mart managers exercised their discretion in a common and discriminatory manner. *Dukes*, 564 U.S. at 356. The plaintiffs produced evidence from a statistician and labor economist that showed that regression analyses indicated that there were "statistically

significant disparities between men and women at Wal-Mart" that could "be explained only by gender discrimination." *Id.* (internal quotations omitted). The Supreme Court rejected this evidence, however, holding that in the class-certification context it is not enough to merely show a sexual disparity in relation to a disparate-impact theory. *Id.* at 356–57. Rather, the plaintiffs needed to link that evidence to a specific employment practice. *Id.* Merely arguing that Wal-Mart's general policy of discretion was the cause was insufficient. *Id.*

Lindsley's statistical evidence in this case holds less water than the plaintiffs' evidence in *Dukes*. Lindsley does not allege that the data in this case underwent any sort of rigid statistical analysis, such as a regression analysis, or that it was compiled and analyzed by a statistician. Thus, unlike the evidence in *Dukes*, it cannot be said here that there are "statistically significant disparities" based on this data, as it is unclear if there were variables that were controlled for, such as applicant pools and experience levels. But even assuming the evidence is facially valid, as the Court in *Dukes* did, 564 U.S. at 356, it does not *connect* the disparities in gender composition or pay to any specific employment practice. The evidence shows only that there are promotional and pay discrepancies between men and women at different Omni hotels and in different departments. Other courts applying *Dukes* have rejected evidence exactly like this. *See Campbell v. Nat'l R.R. Pass. Corp.*, 311 F. Supp. 3d 281, 320 (D.D.C. 2018) ("plaintiffs' statistical experts do little more than establish that African–American candidates are underrepresented in Amtrak's hiring and promotion decisions . . . . This is precisely the sort of statistical evidence rejected as insufficient in *Dukes*."); *Artis v. Yellen*, 307 F.R.D. 13, 26 (D.D.C. 2014) ("Statistical disparities alone, which might show that a particular group is underrepresented, generally are not proof that the class as a whole has been discriminated against."

(quoting *In re Navy Chaplaincy*, 306 F.R.D. 33, 52 (D.D.C. 2014)) (cleaned up)); *Brand v. Comcast Corp., Inc.*, 302 F.R.D. 201, 227–28 (N.D. Ill. 2014) (rejecting argument that statistical evidence proved commonality where it merely showed disparities in average pay and salary). Because Lindsley's data fails to connect the disparities to any specific employment practice, the Court finds her statistical evidence is insufficient to satisfy commonality.

Lindsley's anecdotal evidence is similarly unconvincing. Lindsley has produced only one account of pay and/or promotion discrimination on the part of Defendants—her own. Lindsley has not pointed the Court to a case where one plaintiff's account is sufficient, on its own, to satisfy the "significant proof" commonality requirement. On the other hand, especially when statistical evidence is lacking, courts tend to hold that anecdotal evidence is insufficient to show commonality. *See Ross*, 267 F. Supp. 3d at 174 ("[A]necdotal allegations of the two named plaintiffs fall short of giving rise to any belief that a common mode of discretionary decision making resulted in consistent race discrimination against entire class."); *Boyd v. Interstate Brands Corp.*, 256 F.R.D. 340, 362 (E.D.N.Y. 2009) (holding that anecdotes of "eleven out of 140 prospective class members is not sufficiently large sample to show that discrimination in personnel decisions 'was the company's standard operating procedure.'"); *Kassman v. KPMG LLP*, 2018 WL 6264835, at *23 (S.D.N.Y. Nov. 30, 2018) (declining to find commonality where the plaintiffs relied only on anecdotes and not statistics). While there is no rule that "a discrimination claim, if accompanied by anecdotes, must supply them in number proportionate to the size of the class," *Dukes*, 564 U.S. at 371 (Ginsburg, J. dissenting), one anecdote from one plaintiff is surely not sufficient to show a uniform, companywide practice of discrimination common to all class members. *See Falcon*, 457 U.S. at 158–59 (holding that the

plaintiff's allegations alone that he was passed over for a promotion based on his national origin did not necessarily justify additional inferences that the employer typically discriminated in promotion decisions and that the employer's promotion decisions were motivated by a policy of discrimination). If anything, Lindsley's declaration and testimony show that she was subject to numerous individualized employment decisions by various different supervisors at the different properties where she worked. The Court cannot conclude from this that a general policy of discrimination existed as to other women working in the Food and Beverage Department at Omni.

In sum, like in *Dukes*, because Lindsley has failed to provide convincing proof of a companywide discriminatory pay and promotion policy, this Court finds that she has not established the existence of any common question as Rule 23(a) requires.

B.      *Predominance Under Federal Rule of Civil Procedure 23(b)(3)*

While the Court has already decided that Lindsley's classes should not be certified for failing to meet the commonality requirement, the Court also finds that Lindsley necessarily fails to meet the predominance requirement of Rule 23(b)(3).

Rule 23(b)(3) allows a class action to be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Supreme Court has held that "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Amchem*, 521 U.S. at 609. "Due to the similarities between the two requirements, in class actions

that are sought to be maintained under Rule 23(b)(3), courts will often treat the application of Rules 23(a)(2) and 23(b)(2) together." William B. Rubenstein, 1 *Newberg on Class Actions* § 3:27 (5th ed. June 2019 update). Because the Court found that common issues of law and fact do no exist between the proposed class members, it follows that no commons issues predominate over individual issues for the purposes of Rule 23(b)(3). *See Zuniga v. Bernalillo Cty.*, 319 F.R.D. 640, 693 ("The Plaintiffs' failure to satisfy rule 23(a)(2)'s commonality requirements also implicates predominance.").

However, even if the Court had found that Lindsley had sufficiently proved commonality, the Court would not hold that common issues predominate. As stated above, predominance is far more strict than commonality; it requires not just that common issues exist, but that they predominate over individual ones. Rubenstein, 1 *Newberg on Class Actions*, § 4:51. Thus, the predominance inquiry requires courts to carefully scrutinize the relationship between common questions and individual questions. *Crutchfield v. Sewerage & Water Bd. of New Orleans*, 829 F.3d 370, 376 (5th Cir. 2016) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)). "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods*, 136 S. Ct. at 1045 (quoting Rubenstein, 1 *Newberg on Class Actions* § 4:50 (5th ed. 2012)). "At bottom, the inquiry requires the trial court to weigh common issues against individual ones and determine which category is likely to be the focus of trial." *Crutchfield*, 829 F.3d at 376.

With respect to her two Pay Classes, Lindsley argues that the common question of whether

Defendants implemented a discriminatory policy of paying female supervisory employees less than similarly situated males predominates over all individualized questions. Doc. 49, Mot. for Class Cert., 20. She makes the same argument for the Promotion Classes, only substituting promotional opportunities for pay. *Id.* The only evidence she cites in support of these two arguments is the statistical evidence discussed above. Defendants, relying on *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), respond that the question of whether any class member was subject to pay or promotional discrimination would necessarily have to be answered by examining each member's individual situation. Doc. 54-1, Defs.' Resp., 25.

The Court finds that Lindsley has failed to show that common issues will predominate over individual ones. Lindsley relies on evidence of her own individual experience and unverified statistical evidence, and argues that this evidence points towards "company-wide *de facto* policies of the Food & Beverage department that discriminate against women in pay and promotion as the predominant liability issues in the case." Doc. 61, Pl.'s Reply, 11. The Court assumes this includes Lindsley's allegations related to a "boys'-club" environment at Omni and Morgan's tenure as VP of the Food and Beverage Department. Even considering this evidence, the Court cannot conclude that common issues would predominate in a trial on the merits. The Fifth Circuit's decision in *Allison* is controlling here. In *Allison*, the Fifth Circuit refused to certify a class of black employees who alleged they were discriminated in, among other things, promotion and hiring decisions. 151 F.3d at 407. The court held that the plaintiffs could not satisfy the predominance requirement of Rule 23(b)(3) because individualized determinations were necessary to determine compensatory and punitive damages. Specifically, the court explained:

. . . [R]ecovery of compensatory and punitive damages in Title VII cases requires individualized and independent proof of injury to, and the means by which discrimination was inflicted upon, each class member. The plaintiffs' claims for compensatory and punitive damages must therefore focus almost entirely on facts and issues specific to individuals rather than the class as a whole: what kind of discrimination was each plaintiff subjected to; how did it affect each plaintiff emotionally and physically, at work and at home; what medical treatment did each plaintiff receive and at what expense; and so on and so on. Under such circumstances, an action conducted nominally as a class action would "degenerate in practice into multiple lawsuits separately tried.

*Id.* at 419 (internal quotations and citations omitted).

Since *Allison*, it has been noted that "[f]ew employment discrimination class actions have been certified in the Fifth Circuit." *Colindres v. QuitFlex Mfg.*, 235 F.R.D. 347, 371–72 & n.10 (S.D. Tex. 2006) (denying motion to certify employment discrimination class action under Rule 23(b)(3)). And because of *Allison*, it seems that most employment-discrimination classes that are certified are done so under Rule 23(b)(2), where final injunctive or declaratory relief is requested. *Id.* at 372 (collecting reported cases). Here, Lindsley does not seek certification under Rule 23(b)(2). But Lindsley has not pointed the Court to a Fifth Circuit case, post-*Allison*, where an employment-discrimination class was certified under Rule 23(b)(3). Nor has the Court found such a case on its own. In fact, Lindsley does not even attempt to address or distinguish *Allison* from her case. Lindsley and the putative classes request compensatory damages, including emotional distress, humiliation, embarrassment, and anguish. Doc. 33, 2d. Am. Compl., ¶ 292. They also seek back pay, front pay, and punitive damages. *Id.* ¶ 291. But Lindsley provides no way in which determination of these damages could be done in a uniform way. It seems clear that "individualized and independent proof of injury" will be necessary for each class member, which would result in multiple minitrials or separate suits.

Nor does Lindsley provide a way in which liability could be determined on a classwide basis, with common proof. Lindsley has not identified a facially neutral or objective policy that results in a disparate impact in pay or promotions to the putative class members. And as discussed above, Lindsley's statistical evidence shows only that there may be a disparity in pay or promotion based on sex—it does not show whether these discrepancies were caused by a single policy, applied to all putative class members in the same way, such that resolution of the discriminatory impact of that policy could be resolved in one proceeding. Additionally, Lindsley's individual allegations relating to her personal claims highlight how unsuited this case would be for class resolution; from 2001 when she started at Omni to 2016 when she resigned, Lindsley went through a myriad of promotions and salary changes that were made at a number of different Omni locations by a number of different managers. Her interactions with Morgan and other male Omni executives that she alleges are discriminatory are experiences that are specific to her. Her claim that she was not promoted to the Houston Food and Beverage Director position involves facts that apply only to her, as well as her disparate pay claims. Moreover, Defendants' defenses for such claims—*e.g.*, whether there were legitimate, nondiscriminatory reasons for pay and promotion decisions—also involves facts that apply solely to Lindsley's claims. Because Lindsley has identified no specific employment practice or general policy of discrimination that applies uniformly to each class members, the claims of pay and promotion class members of Lindsley's proposed classes would be similarly fact specific.

To conclude, the Court holds that individual issues predominate, by far, over common issues of the proposed class members in this case. Lindsley has therefore not met Rule 23(b)(3)

predominance requirements.[6]

## IV.

## CONCLUSION

Based on the aforementioned reasons, the Court finds that Lindsley has not met her burden of satisfying the requirements of Rule 23 on her motion for class certification (Doc. 49). The Court therefore **DENIES** Lindsley's motion (Doc. 49). Because Lindsley's motion has been denied, the Court also **DENIES as moot** Defendants' motions to strike related to Lindsley's class-certification motion (Docs. 55 & 56).


SO ORDERED.

SIGNED: July 1, 2019.

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

---

[6] The Court does not reach the issue of whether Lindsley has met Rule 23(b)(3)'s superiority requirement.